UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EUGENE TAYLOR,                       :
                                     :CIVIL ACTION NO. 3:14-CV-1247
          Plaintiff,                 :
                                     :(JUDGE CONABOY)
          v.                         :
                                     :
CAROLYN COLVIN,                      :
Acting Commissioner of               :
Social Security,                     :
                                     :
          Defendant.                 :
                                     :
_____

**MEMORANDUM**

     Here we consider Plaintiff's Appeal of Defendant's denial of
Disability Insurance Benefits ("DIB") and Supplemental Security
Income ("SSI") under Titles II and XVI of the Social Security Act
("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  (Doc. 1.)   The
Administrative Law Judge ("ALJ") who evaluated the claim found that
Plaintiff had the residual function capacity ("RFC") to perform
light work with certain limitations and that such work was
available.  (R. 62-67.)   The ALJ therefore denied Plaintiff's claim
for benefits.  (R. 67.)   With this action, Plaintiff argues that
the decision of the Social Security Administration is error for
several reasons: the ALJ did not properly consider and give the
required weight to mental and physical RFC assessments; the ALJ
improperly relied on certain Global Assessment of Functioning
("GAF") scores; and the ALJ did not adequately explain his reasons
for finding Plaintiff's testimony not credible.  (Doc. 7 at 13-15.)
For the reasons discussed below, we conclude Plaintiff's appeal of

the Acting Commissioner's decision is properly granted.

## I. Background

### A.  *Procedural Background*

On August 27, 2009, applications were completed for DIB and SSI (R. 133, 137), Plaintiff having protectively filed on July 20, 2009 (R. 58).  In both applications, Plaintiff alleged disability beginning on July 1, 2006.  (R. 135, 137.)  His date last insured for the purpose of DIB was September 30, 2009.  (R. 58.)  In the Disability Report, Plaintiff stated that he was unable to work because of back injury and herniated discs.  (R. 169.)  He also answered "yes" to the question of whether he had been seen by a doctor/hospital/clinic for emotional or mental problems that limited his ability to work, indicating he was treated for ADHD in 2007. (R. 171.)

Plaintiff's claims were initially denied on June 15, 2010. (R. 105-14.)  Plaintiff filed a request for a review before an ALJ on June 22, 2010.  (R. 115.)  On May 26, 2011, Plaintiff, with his attorney, appeared at a hearing before ALJ Ronald Sweda.  (R. 71.) Vocational Expert Sean C. Hanahue also testified at the hearing. (*Id.*, R. 58.)  The ALJ issued his unfavorable decision on June 20, 2011, finding that Plaintiff was not disabled under the Social Security Act.  (R. 55-70.)

On August 6, 2011, Plaintiff filed a Request for Review with the Appeals Council.  (R. 53-54.)  The Appeals Council denied

Plaintiff's request for review of the ALJ's decision on December 18, 2012.  (R. 43-48.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 43.)  However, on May 5, 2014, the Appeals Council set aside the December 18, 2012, decision to consider additional information.  (Doc. 1 at 5.)  The Appeals Council again denied Plaintiff's request for review, noting that it had considered the additional evidence submitted and found it did not provide a basis for changing the ALJ's decision because the evidence concerned a later time.  (Doc. 1 at 5-6.)  The Appeals Council added that Plaintiff should apply again if he wanted consideration of whether he was disabled after the date of ALJ's decision, i.e., after June 20, 2011.  (Doc. 1 at 6.)

On June 30, 2014, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on September 3, 2014.  (Docs. 5, 6.)  Plaintiff filed his supporting brief on October 20, 2014.  (Doc. 7.)  Defendant filed her opposition brief on November 19, 2014.  (Doc. 8.)

**B.    *Factual Background***

Plaintiff was born on September 26, 1966.  (R. 164.)  He completed ninth grade in 1986 and did not attend special education classes.  (R. 173.)  Since the alleged onset of disability on July 1, 2006, Plaintiff worked for approximately two months unloading carpets.  (R. 76.)  His attorney clarified that at the time he was

3

at "a halfway house while incarcerated."  (R. 77.)

1.    **Physical Impairment Evidence**

On July 3, 2007, Plaintiff was seen as a new patient by Andrea
Wessel, M.D., for complaints of chronic back pain which Plaintiff
had for years with reported worsening over the preceding one to two
months.  (R. 293.)  Plaintiff noted greater pain on the left side
than on the right with stiffening and occasional sharp intermittent
pain, occasional radiation to his left hip, and occasional
radiation to the left heel area.  (*Id.*)  He rated the pain at the
time as a seven out of ten.  (*Id.*)  Office notes indicate
Plaintiff's last MRI was on August 12, 1999.  (R. 294.)  It showed
minimal central canal and neural foraminal narrowing, a small disc
bulge at L4-5, and slight levoscoliosis.  (*Id.*)  Upon examination,
Dr. Wessel found Plaintiff had a reduced range of motion in his
back secondary to pain and mild palpable muscle spasms paralumbar.
(R. 295.)  Dr. Wessel advised Plaintiff to take Motrin and Zantac,
and apply moist heat to his lower back.  (*Id.*)  Plaintiff was to
return in about four weeks.  (R. 296.)

Plaintiff also had an MRI of the lumbar spine on July 3, 2007.
(R. 309.)  The Impression indicates the following: small focal
central disc herniation at L4-5 with borderline canal diameter;
borderline canal diameter at L3-4 secondary to disc bulge and facet
and ligamentum flavum hypertrophy; and small central disc
herniation at L5-S1 without canal compromise.  (*Id.*)  An x-ray of

4

the lumbosacral spine on the same date indicates "straightening of the lumbar lordosis with mild spondylotic changes . . . . No acute radiographic abnormality is identified."  (R. 310.)

On August 6, 2007, Plaintiff saw Dr. Wessel for follow up on his back pain.  (R. 292-93.)  Plaintiff reported that he still had aching in his lower back on a daily basis and it was worse with bending or lifting.  (R. 293.)  Plaintiff was using Naproxen with some relief.  (*Id.*)  He was not attending physical therapy as had been previously recommended.  (*Id.*)  Plaintiff was directed to continue taking Naproxen and apply heat to the painful area and return for follow up in about six months.  (R. 293.)

Though many notes contained in records from the Pennsylvania Department of Corrections are not legible (*see* R. 242-61), some Progress Notes indicate Plaintiff had back problems while incarcerated.  On October 26, 2007, Plaintiff reported chronic constant lower back pain and requested anti-inflammatory medicine. (R. 258.)  A November 8, 2007, Progress Note states that Plaintiff was admitted to the infirmary because of lower back pain: he was grimacing with movement, had an unsteady gait and rated his pain at eight out of ten.  (R. 259.)  He was given medication and warm compresses.  (*Id.*)  A November 9, 2007, Progress Note quotes Plaintiff as stating he was feeling better, his pain was about a two, and he was moving slowly and guardedly.  (R. 256.)  By November 16, 2007, Plaintiff was reported to be doing well.  (R.

257.)  A January 29, 2009, Progress Note states that Plaintiff had lower back pain and herniated discs but he was not taking any medication, had no physical restrictions, and was employable.  (R. 251.)

Following Plaintiff's two-year incarceration, he saw Dr. Wessel for an office visit on July 22, 2009.  (R. 289.)  Dr. Wessel noted that Plaintiff had an ongoing problem with lower back pain, he had a history of lumbar disc disease, and he had been referred for pain therapy in 2007 but never had injections due to his incarceration.  (*Id.*)  Plaintiff reported his pain was greater on the right side than on the left.  (*Id.*)  He described the pain as constant throbbing, eight on a scale of one to ten, with occasional snapping pain and radiation to the right buttock and posterior thigh.  (*Id.*)  Plaintiff also reported the pain was worse with leg elevation, prolonged sitting, walking, and standing.  (R. 290.)  He further reported that he got some relief with "stretching back out."  (*Id.*)  Upon examination Dr. Wessel noted that Plaintiff's back was straight, he had a reduced forward bend and paralumbar spasms.  (R. 291.)  Plaintiff had a negative straight leg raise. (*Id.*)  Dr. Wessel recommended moist heat, pain therapy referral, MRI of the spine, and a follow up visit in four weeks.  (R. 292.)

On August 10, 2009, Plaintiff had MRI of the lumbar spine. (R. 311.)  The Clinical Indication was "concern regarding backache/disc disease.  The patient reports worsening low back pain

6

with burning and cramping in the left lower extremity." (*Id.*)

This study was reviewed and compared to the July 3, 2007, MRI:

> Slight progression of degenerative change in the mid to lower lumbar region since 07/03/07.
>
> Small central disc herniation at L5-S1, similar in size to the prior study. There is now progressive signal change in the posterior aspect of the L5-S1 disc typically seen with an annular tear. This is more conspicuous than in the prior study.
>
> Slight to mild disc herniation at L4-5 favoring the left side of midline, slightly smaller than on the prior study consistent with slight interval dessication. This is more apparent to the right of midline. This contributes to mild canal stenosis and mild to moderate bilateral lateral recess narrowing, greater on the left. The overall degree of lateral recess narrowing on the right is slightly improved since the prior study. There is medial foraminal narrowing bilaterally, greater on the left, without compression of the exiting L4 nerves.
>
> Broadbased disc bulge at L3-4 similar in appearance to the prior study without frank herniation of significant canal stenosis.
>
> Slight disc bulging at L2-3, more prominent than on the prior study with evidence of interval progression of degenerative since 07/03/07. The L1-2 and T12-L1 discs remain within normal limits.

(R. 311-12.))

On September 9, 2009, Englok Yap, M.D., administered a lumbar epidural steroid injection to treat Plaintiff's back pain. (R. 274-75.) Dr. Yap assessed Plaintiff to have lumbar disc displacement. (R. 275.)

7

On October 1, 2009, Plaintiff saw Dr. Wessel for follow up on his back disorder.  (R. 288.)  Plaintiff was to continue with Naproxen for his lumbar disc problem.  (R. 289.)

On October 8, 2009, Plaintiff again saw Dr. Yap for evaluation of ongoing low back and left leg pain.  (R. 266.)  Plaintiff reported that his low back pain resolved after his September 9, 2009, steroid injection but his left leg pain continued and was constant--radiating from his left buttock into his left posterior thigh, calf and sole of foot.  (*Id.*)  Plaintiff had normal flexion and extension, and normal gait and rotation.  (*Id.*)  Dr. Yap administered a second steroid injection to treat Plaintiff's lumbar disc displacement and noted that Plaintiff may benefit from a left S1 nerve root at his next visit.  (R. 267.)

On December 11, 2009, Plaintiff saw Michel Lacroix, M.D., for surgical advice.  (R. 333.)  Because of his herniated disc, Plaintiff had been referred to Dr. Lacroix by Dr. Yap.  (*Id.*)  Plaintiff reported worsening pain over the preceding year.  (*Id.*)  He further reported the pain to be constant, accentuated by exercises and transfers, and the pain could be excruciating in the morning.  (*Id.*)  Plaintiff had seen a chiropractor and pain management without success, but Neurontin and NSAIDS provided moderate help.  (*Id.*)  Dr. Lacroix found that Plaintiff's back was painful with flexion and extension, was nontender along the spine and paraspinal regions, he had no palpable muscle spasms, and leg

8

squat was painful.  (R. 335.)  Imaging revealed spondylosis, multilevel degenerated disc disease with bulging, central disc herniation L5/S1 without significant mass effect, and no significant central or foraminal stenosis.  (R. 336.)  Dr. Lacroix advised Plaintiff that there was no significant lesion which would be successfully addressed by spinal surgery.  (*Id.*)  Dr. Lacroix reported that he insisted to Plaintiff that he follow a healthy lifestyle and continue with pain management, but if his symptoms should be linked with a more significant pathology in the future, Plaintiff could be reevaluated.  (*Id.*)  Plaintiff was to return in about four months.  (R. 406.)

On December 15, 2009, Plaintiff had a follow up visit with Dr. Wessel and requested a reevaluation with pain therapy.  (R. 403.) Plaintiff complained of ongoing lumbar pain which he rated eight out of ten.  (*Id.*)  Upon examination, Dr. Wessel found Plaintiff's back to be straight with paralumbar tenderness and palpable muscle spasms.  (R. 404.)  Dr. Wessel aslo found positive straight leg raising on the left and noted Plaintiff reported numbness to touch in the knee area.  (*Id.*)

On April 27, 2010, Feroz Sheikh, M.D., completed a Physical Residual Functional Capacity Assessment.  (R. 341-47.)  No treating or examining source statements regarding Plaintiff's physical capacities were included in the file.  (R. 345.)  He concluded Plaintiff had the following exertional limitations: he could lift

9

twenty pounds occasionally and ten pounds frequently; he could stand and/or walk for a total of about six hours in an eight-hour workday; he could sit for about six hours in an eight-hour workday; he could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl.  (R. 342-43.)  Plaintiff had no manipulative, visual or communicative limitations.  (R. 343.)  Plaintiff's only environmental limitation was that he was to avoid concentrated exposure to hazards including machinery and heights.  (R. 344.)  Dr. Sheikh found that the medical evidence establishes a medically determinable impairment of DDD LUMBAR SPINE.  (R. 346.)  He found Plaintiff to be partially credible.  (*Id.*

Plaintiff again saw Dr. Wessel on June 3, 2010.  (R. 415.)  Plaintiff rated his back pain as nine out of ten and reported it was "relieved by nothing."  (*Id.*)  Plaintiff expressed an interest in seeing pain therapy.  (*Id.*)  Upon examination, Dr. Wessel found Plaintiff's back to be straight, with "ok" range of motion, and paralumbar tenderness.  (R. 416.)  Dr. Wessel recommended moist heat to the painful area, Naproxen, Flexeril for muscle spasm as needed, and pain therapy referral.  (*Id.*)  Plaintiff was to return in three months.  (*Id.*)

On July 1, 2010, at Dr. Wessel's request Plaintiff had an Initial Physiatric Consultation at Northeastern Rehabilitation Associates to determine what else could be done to diminish his pain and improve his function.  (R. 390.)  Elizabeth Karazim-

Horchos, D.O., conducted the evaluation.  (*Id.*)  Plaintiff rated
his pain as seven to ten out of ten and reported that it had been
getting worse, he did not feel Dr. Yap's epidural injections were
effective, chiropractics made his problem worse, and he had not had
physical therapy in the past.  (*Id.*)  Plaintiff reported that he
could sit, stand, or walk for thirty minutes at most.  Dr. Karazim-
Horchos reviewed Plaintiff's August 2009 imaging studies of his
back and found that they showed degenerative disc disease in the
lumbar spine and central disc herniation at L5-S1 with an annular
tear and disc herniation at L4-5 and broad based disc bulge at L3-
4.  (*Id.*)  Upon physical examination Dr. Karazim-Horchos recorded
the following:

> He is 5'9" and weighs 220 pounds.  Motor
> strength is functional in the lower
> extremities.  His gait is non-antalgic.
> Transfers are smooth and easy.  Extremities
> are without edema, clubbing or cyanosis.
> Positive straight leg raising, right lower
> extremity.  Positive cross straight leg
> raising sign, left lower extremity.  Hip
> range of motion, internal and external
> rotation precipitates increased pain
> laterally into right posterior sacroiliac
> sulcus.  Positive Gaenslen's maneuver.  He
> has discomfort on palpation at the right
> posterior sacroiliac area.  Lumbar flexion
> and extension all precipitate increased pain
> in the lower lumbar segments.  He has no
> paraspinal muscle spasm, edema or erythema.

(R. 391.)  Dr. Karazim-Horchos's impression was "chronic pain
syndrome, intravertebral disc degeneration, low back pain,
discogenic low back pain, probable sacroiliitis."  (*Id.*)   The plan

11

was to address the inflammatory component of his pain with a course
of Predisone, refer him for a course of physical therapy for
lumbosacral stabilization exercise and evaluation for a TENS unit
which would be an adjunctive pain control. (*Id.*)  Dr. Karazim-
Horchos planned to see Plaintiff again in four weeks and, if he was
not significantly better, she would consider pursuing some
epidurals and/or sacroiliac injection and a facet block. (*Id.*)

On September 14, 2010, Plaintiff was seen at Northeastern
Rehabilitation for follow up. (R. 397.)  Dr. Karazim-Horchos notes
that some reports indicate that epidurals were helpful. (*Id.*)  She
reported that Plaintiff had gone to physical therapy for one visit
and the therapist said he was not compliant. (*Id.*)  She
recommended that Plaintiff observe proper body mechanics, continue
on his medications and return in three to four months. (*Id.*)  She
also noted that she "discussed with him to follow up with OVR to
determine if something he could do for employment as he is
interested in that."[1]  (*Id.*)

On December 20, 2010, Dean Mozelski, M.D., of  Northeastern
Rehabilitation administered lumbar facet joint intra-articular
injection at the request of Dr. Karazim-Horchos. (R. 398.)  Dr.
Mozelski reported no complications. (*Id.*)

On January 4, 2011, Dr. Karazim-Horchos saw Plaintiff for

---

[1]  The Office of Vocational Rehabilitation is often referred
to as OVR.

follow up.  (R. 399.)  Plaintiff reported that he was not doing well, his pain continued, and he did not find the facet injections were particularly helpful.  (*Id.*)  She noted Plaintiff continued to use Neurontin with "fairly good effect and he will continue with this medication."  (*Id.*)  Dr. Karazim-Horchos suggested he again try physical therapy but he stated he was not able to do so secondary to co-pays and scheduling difficulties.  (*Id.*)  Dr. Karazim-Horchos then discussed several exercises he could do on his own and showed him how to do them.  (*Id.*)  She asked Plaintiff to try to do them for at least ten to fifteen minutes twice a day.  (*Id.*)  The plan was to see Plaintiff again in six months or sooner if need be.  (*Id.*)

On May 3, 2011, Dr. Karazim-Horchos completed a form assessing Plaintiff's ability to do work-related activities on a day-to-day basis.  (R. 400-402.)  She recorded the following findings: Plaintiff could stay on his feet for three hours at a time, stand and walk for four hours, sit for 6 hours at any one time and sit for a total of eight hours; Plaintiff could lift and carry up to nineteen pounds continuously and up to forty-nine pounds frequently; Plaintiff had no limitations using his hands, legs and feet; Plaintiff was occasionally able to bend, squat, crawl and climb stairs, and could continuously reach; and Plaintiff had a mild limitation regarding exposure to the stress of a competitive work setting on a sustained full-time basis and a moderate

13

limitation against driving automotive equipment.  (R. 400-01.)  Dr. Karazim-Horchos reported that Plaintiff did not have to elevate his lower extremities for a significant amount of time daily, and she did not know if he had problems with stamina and endurance which would interfere with daily activities in a work environment.  (*Id.*) She noted that she believed Plaintiff's complaints of pain, listing Plaintiff's spinal conditions to be the cause of the pain as supported by MRI findings showing an annular tear at L4-L5, and disc herniation at L5-S1.  (R. 401.)  Dr. Karazim-Horchos noted that previously identified limitations could be further reduced by the pain and his pain is present at the levels described.  (*Id.*) She further noted that the degree of pain was occasionally debilitating and she did not know if Plaintiff had any psychological conditions which affected his pain or if he was a malingerer.  (R. 402.)  Dr. Karazim-Horchos opined that Plaintiff's symptoms would often interfere with his attention and concentration.  (*Id.*)  She reported that he would need to take two fifteen to thirty minute unscheduled breaks during an eight-hour workday.  (*Id.*)  She also noted that Plaintiff would likely be absent from work about three times a month as a result of his back impairment.  (*Id.*)

On June 4, 2011, Dr. Mozelski of Northeastern Rehabilitation saw Plaintiff at the request of Dr. Karazim-Horchos.  (R. 482.)  He administered a socroiliac joint injection without incident.  (*Id.*)

2.   __Mental Impairment Records__

A November 8, 2005, intake note from Scranton Counseling
Center, states that Plaintiff was seen for complaints of
aggravation and irritation and he had ongoing problems including
arrests for aggravated and simple assault.  (R. 454.)  Plaintiff
reported he was trying to keep his anger under control by punching
walls but had dislocated his hand as a result.  (*Id.*)

A November 9, 2005, Psychiatric Evaluation from the Scranton
Counseling Center indicates that Plaintiff reported having social
problems due to aggression during his school years, was diagnosed
with Adult ADHD, had a recorded GAF of 66, and was prescribed
medication for his mental health problems.  (R. 446-453.)

In November of 2005, Plaintiff did not show for his
appointment at Scranton Counseling Center.  (*Id.*)  In December
2005, Plaintiff cancelled his appointment.  (*Id.*)

Plaintiff did not show for another intake appointment in 2007,
but eventually was seen and reported he was going to prison.  (*Id.*)

A Scranton Counseling Center Evaluation form dated July 19,
2007, shows that Plaintiff was separated from his wife and living
with his mother at the time.  (R. 455.)  He was unemployed and
living on public assistance.  (*Id.*)  Plaintiff's chief complaint
was that he was constantly aggravated and feeling he was going to
lose his temper with someone.  (R. 456.)  The evaluator noted that
he showed twisted thinking and wanted to die.  (*Id.*)  Plaintiff

15

reported that he did not like to be around people, he had problems
with concentration, racing thoughts and memory, felt anxious,
depressed and overwhelmed.  (*Id.*)  Plaintiff stated that he had
been incarcerated a total of ten years, he was not on probation or
parole at the time, but he was involved with a simple assault case
related to his daughter's boyfriend.  (R. 461.)  The evaluator
reported that Plaintiff was cooperative, answered questions
appropriately, had an appropriate affect and anxious mood with
coherent thought processes, fair judgment and adequate
concentration and attending skills.  (R. 465-66.)  The Diagnostic
Impression identifies Adult ADHD, chronic back problems, problems
with his sister and the legal system, and a GAF of 55 with a GAF of
60 having been the highest in the past year.  (R. 467.)  The
evaluator also found it necessary for Plaintiff to be treated with
pharmacotherapy to address mood instability and psychosocial issues
and he was prescribed Focalin and Celexia.  (R. 468-69.)

On August 15, 2007, a Physician Progress Note from Scranton
Counseling Center shows that Plaintiff's mood was depressed but his
affect was appropriate, he had good concentration and attention,
his mental status was oriented, and he reported his medications
were helpful.  (R. 470.)  Plaintiff's medications were changed to
Doxepin and Ritalin.  (*Id.*)  He was to return in four weeks but did
not show for his September 19, 2007, appointment.  (*Id.*)

Pennsylvania Department of Corrections health records contain

16

a Mental Health Referral Form which notes that Plaintiff was referred on October 3, 2007, based on his history of depression. (R. 247.)  On October 5, 2007, the staff member completing the assessment reported that Plaintiff was stable and denied the need for mental health services.  (R. 245, 247.)

An October 26, 2007, prison health record Progress Note states that Plaintiff reported a history of depression and that he had taken Doxepin but he asked to be taken off the medication (stating he had not taken it for two weeks).  (R. 258.)  The Progress Note indicated he would be referred to a psychologist.  (*Id.*)

A December 17, 2007, prison health record Progress Note acknowledges Plaintiff's history of depression but indicates he did not feel that he needed to be "seen by psych at this time."  (R. 253.)

A January 27, 2009, prison health record  Progress Note states that Plaintiff had a "present diagnosis" which included depression. (R. 252.)  He had no medications prescribed.  (*Id.*)

A September 15, 2009, Scranton Counseling Center evaluation indicates that Plaintiff was living with his twenty-five year old son, was unemployed and supported by public assistance.  (R. 320.) Plaintiff reported a history of ADHD and cyclothymic disorder.  (R. 321.)  The evaluator determined it medically necessary for Plaintiff to receive medication for ADHD, Bipolar Disorder and anger and Plaintiff was prescribed Seroquel and Concerta.  (R. 322-

17

23, 443.)

On November 12, 2009, a Scranton Counseling Center Initial Treatment Plan indicated Plaintiff's GAF was 60, and that he had problems related to social environment, occupation, finances, and the legal system.  (R. 325.)  Goals and interventions were devised to address his ADHD, Bipolar Disorder, and anger control problems. (*Id.*)  A progress note from the same date states that Plaintiff reported that his medications were not helping, and he continued to have trouble controlling his anger.  (R. 328.)  The evaluator recorded that Plaintiff was pleasant but appeared slightly nervous and frustrated.  (*Id.*)

A Physician Progress Note dated December 2, 2009, reports Plaintiff to be friendly and cooperative; his concentration and attention were "ok"; his affect was appropriate and his mental status oriented.  (R. 326.)  Plaintiff said he did not find the Concerta helpful and he wanted to go back on Doxepin instead of the Seroquel he was taking.  (*Id.*)  The Physician's Order Sheet dated December 2, 2009, shows that Plaintiff was prescribed Ritalin and Doxepin.  (R. 324.)

On February 5, 2010, Interdisciplinary Progress Notes from Scranton Counseling Center note that Plaintiff reported he was doing well on his medications and felt they were helpful in controlling his temper.  (R. 426.)  It was also noted that Plaintiff appeared calm and pleasant, and the possibility of anger

18

management would be discussed at his return visit in eight weeks. (*Id.*)

On February 24, 2010, Nelson Asante, M.D., of the Scranton Counseling Center noted that Plaintiff was doing fairly well. (R. 425.)  His mood was anxious but he was cooperative and his affect was appropriate. (*Id.*)  Plaintiff reported that his medications were helpful. (*Id.*)

On May 4, 2010, Plaintiff reported mood swings, and said he had an altercation with his daughter which resulted in her filing "a harassment suit" against him. (R. 427.)  Plaintiff said he was waiting for his hearing date and he wanted to get off probation, be able to be eligible for SSI and eventually move out of the city. (*Id.*)  A GAF of 60 was recorded at the visit. (*Id.*)

On May 11, 2010, Thomas Smith, Psy.D., completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (R. 348-54.)  Based on a clinical interview (R. 353), Dr. Smith found that Plaintiff's ability to understand, remember, and carry out instructions are affected by his mental impairments: he has moderate restrictions in his ability to understand and remember short, simple instructions, carry out short and simple instructions, and understand and remember detailed instructions; he has marked-extreme restrictions in his abilities to carry out detailed instructions and make judgments on simple work-related

decisions.[2]   (R. 350.)   Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting was affected by his impairments: he had marked-extreme limitations in all five subcategories.[3]   (*Id.*)   Dr. Smith's Diagnostic Impressions identified the following: mood disorder and ADHD by history; employment, relationship and financial problems; and a GAF of 40-50.   (R. 354.)   He summarized his findings as follows:

> The claimant presents himself in the interview with history of intolerance, anger, and relationship problems again throughout his whole life.  He reports . . . "I can't stand people who are intolerant, ignorant, and stupid."  He reports there is a lot of crisis and problems in his personal life "that I did not do that I got blamed for because of other people's ignorance and behaviors.  It seems that people just keep interfering with my life."  The claimant's cognitive schema of how he sees himself in the world and how the world has impacted him seems to be a significant obstacle in his ability to engage and interact in this world.  Some intensive outpatient assistance and individual treatments along with a reevaluation or may be pharmacological treatment certainly could be beneficial to this individual.  I hope that the person will follow up with such recommendations.

(R. 354.)

    A Psychiatric Review Technique completed by Mark Hite, Ed.D.,

---

[2]   Dr. Smith marked both "Marked" and "Extreme" categories. (R. 350.)

[3]   *See* n.2.

on June 11, 2010, reports that Plaintiff has the medically determinable impairments ADHD and Mood Disorder.  (R. 369, 371.) Dr. Hite found that Plaintiff had the following functional limitations: moderate limitation in difficulties in maintaining social functioning; and moderate limitation in maintaining concentration, persistence, or pace.  (R. 378.)  Based on his review of the evidence in the file, Dr. Hite concluded Plaintiff was moderately limited in the following areas: ability to carry out detailed instructions; ability to make simple work-related decisions; ability to interact appropriately with the general public; and ability to accept instructions and respond appropriately to criticism from supervisors.  (R. 381, 382.)  Dr. Hite provided the following summary:

> The claimant alleges disability due to back injury, herniated discs and attention deficit hyperactivity disorder.
>
> The medical evidence establishes medically determinable impairments of Mood Disorder NOS and Adhd By History.  He is 43 years old and has completed 9 years of formal education. He hasn't had any hospitalizations because of his mental impairments.
>
> Claimant had a brief period of psychiatric treatment from 10/09 to 12/2/09 (Dr. Asante). He did not respond to medications and stopped going.  A recent CE (Thomas Smith, PsyD) was conducted.  The report indicates that the claimant has difficulty with relationships, anger issues, and intolerance of others.  No significant cognitive impairments were identified.  He only finished the 9th grade in school, but, did not attend special education classes.  His last notes from Dr.

Asante rated his GAF at 60, indicating
moderate mental impairment (11/2/09;
12/2/009).  He is fully capable of performing
all routine ADL's and self-care independently
and he can prepare complete meals, does
laundry, light chores, uses public
transportation, goes out alone, shops, pays
bills.

The claimant's basic memory processes are
intact.  He is capable of working within a
work schedule and at a consistent pace.  He
can make simple decisions.  He is able to
carry out very short and simple instructions.
Moreover, he is able to maintain
concentration and attention for extended
periods of time.  He is self-sufficient.
Additionally, he retains the ability to
perform repetitive work activities without
constant supervision.  There are no
restrictions in his abilities in regards to
understanding and memory and adaptation.

Based on the evidence of record, the
claimant's statements are found to be
partially credible.

The opinion stated within the report received
6/3/2010 provided by Thomas P. Smith, Psy.D.,
an examining source, has been considered.
The residual functional capacity assessment
is different than the opinions expressed by
Thomas P. Smith, Psy.D. in the report
received 6/3/2010 due to inconsistencies with
the totality of the evidence in file.  Some
of the opinions cited in the report are
viewed as an overestimate of the severity of
the claimant's functional restrictions.  The
examining source statements in the report
concerning the claimant's abilities in the
areas of making occupational adjustments,
making performance adjustments and making
personal and social adjustments are not
consistent with all of the medical and non-
medical evidence in the claims folder.  The
psychologist's report appears to contain
inconsistencies.  Therefore, the
psychologist's opinion in this report is less

> persuasive.  The psychologist's opinion is
> without substantial support from the other
> evidence of record, which renders it less
> persuasive.  Therefore, the report submitted
> by Thomas P. Smith, Psy.D., received
> 6/3/2010, is given appropriate weight and is
> partially consistent with this assessment.
>
> The claimant is able to meet the basic mental
> demands of competitive work on a sustained
> basis despite the limitations resulting from
> his impairments.

(R. 383-84.)

At his visit with Dr. Asante on June 11, 2010, Plaintiff reported increased stress and said he did not feel his medications were helpful.  (R. 429.)  Dr. Asante noted Plaintiff's affect to be appropriate, his mental status oriented and his mood alert and cooperative.  (*Id.*)

At his June 29, 2010, visit to Scranton Counseling Center, Plaintiff reported an altercation with his mother that resulted in a disorderly conduct charge against him.  (R. 431.)  He again said that his medications were not working.  (*Id.*)

On July 14, 2010, Dr. Asante found Plaintiff's mood depressed but he was cooperative and his affect was appropriate. (R. 432.) Dr. Asante recorded a GAF of 56.  (R. 433.)

In a September 28, 2010, Treatment Plan Update, Plaintiff's GAF was recorded to be 60 and his strengths were listed as "independent, resilient, caring, cooperative, intelligent."  (R. 434.)  Mood swings, ADHD, legal issues and anger control were listed as barriers to treatment.  (*Id.*)  Plaintiff reported that he

23

was recently able to talk himself out of situations and would like to continue to improve in that area; he rated his mood swings as four or five and wanted to get down to two or three. (*Id.*) He had a three to four month target date for meeting these goals. (*Id.*)

On October 6, 2010, Plaintiff missed his appointment with Dr. Asante but called later in the month regarding his medications. (R. 435.)

On October 25, 2010, Dr. Asante reported Plaintiff's mood as depressed, alert, and cooperative, his affect appropriate, and his mental status oriented. (R. 436.) Dr. Asante notes ongoing depression, poor sleep and Plaintiff's assessment that his medications were not helpful. (*Id.*) Plaintiff was to return to see Dr. Asante on December 15, 2010. (*Id.*)

On December 15, 2010, Dr. Asante noted Plaintiff's mood to be euthymic and cooperative, his affect appropriate, and his mental status oriented. (R. 438.) He noted Plaintiff's mood to be stable and concentration better. (*Id.*) Plaintiff was to return in three months. (*Id.*)

In a December 27, 2010, Interdisciplinary Progress Note, it was recorded that Plaintiff apparently lost his medical card and was told that only one of his medications could be refilled. Plaintiff said "Don't worry about it" and left the office. (R. 440.)

Plaintiff did not show up for his January 5, 2011, and

24

February 23, 2011, appointments.  (R. 440.)  He cancelled his March 9, 2011, appointment.  (*Id.*)  Plaintiff again did not show up for his April 5, 2011 appointment.  (*Id.*)

On April 25, 2011, Plaintiff again saw Dr. Asante.  (R. 441.) His mood was friendly and cooperative, his affect appropriate and his mental status oriented.  (*Id.*)  Dr. Asante noted that Plaintiff's mood was getting more and more unstable, and he had been off his medications but wanted to go back on his original medications.  (*Id.*)  His GAF was noted to be 55.  (R. 442.) Ritalin and Doxepin were prescribed.  (R. 445.)

On May 6, 2011, Elizabeth A. Ciaravino, Ph.D., saw Plaintiff for a psychological evaluation.  (R. 471.)  She conducted a clinical interview, administered the Wechsler Adult Intellignece Scale - Third Edition, and completed a Mental Residual Functional Capacity Assessment.  (*Id.*)  In her Diagnostic Impression, Dr. Ciaravino stated that Plaintiff

> was oriented to time, place and person.
> Speech was fairly clear, coherent, and goal
> directed.  Mood was mildly tense, and affect
> depressed.  Information and intelligence
> appears to be in the borderline range.  There
> was no evidence of any formal thought
> disorder.  He admits passive suicidal
> ideation, without any definable plan for self
> harm.  He denies homicidal ideation.  Impulse
> control and judgment are extremely tenuous.

(R. 473.)  Dr. Ciaravino also recorded the following: Bipolar II Disorder (Recurrent Major Depressive Episodes with Hypomanic Episodes); Attention Deficit/Hyperactivity Disorder, Combined Type;

25

Borderline range of intellectual functioning; Chronic pain; Psychosocial stressors are severe, given awareness of self-isolation and poor coping skills and intellectual limitations; Current GAF of 55 and best in year 55. (*Id.*)  She concluded that Plaintiff's overall prognosis was fair, explaining that "[h]e has brittle coping skills in the face of stress.  His concrete coping skills do not allow him to handle difficult interpersonal situations with ease.  The above issues are part of his personality development, the Borderline Intellectual functioning, as well as the Bipolar Disorder and Attention Deficit Disorders."  (R. 474.)

On May 13, 2011, Dr. Ciaravino completed a Mental Residual Functional Capacity Assessment.  (R. 475-76.)  She determined that Plaintiff was moderately impaired in the following areas: ability to understand and remember short and simple repetitive instructions or tasks; ability to make simple work-related decisions; ability to ask simple questions or request assistance from supervisors; ability to be aware of normal hazards and take necessary precautions; and ability to travel in unfamiliar settings and use public transportation.  (*Id.*)  Dr. Ciaravino found moderately severe (not precluded but substantially impaired) limitations in the following categories: ability to remember locations and work-like procedures; ability to understand and remember detailed (3 or more steps) instructions which may or may not be repetitive; ability to carry out short and simple (one or two-step) repetitive

instructions which may or may not be repetitive; ability to sustain ordinary routine without special supervision; ability to interact appropriately with the general public or customers; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and ability to set realistic goals or make plans independently. (*Id.*) She reported severe limitations (activity totally precluded on sustained basis) in the following areas: ability to maintain attention and concentrate for at least two straight hours with at least four such sessions in a workday; ability to work in coordination with or proximity to others without being distracted; ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace; ability to respond appropriately to expected changes in the work setting; and ability to respond appropriately to unexpected changes in the work setting. (*Id.*) Dr. Ciaravino also found the effect of several work related stressors would likely increase the level of impairment indicated above, that a simple entry-level job would serve as a stressor which would exacerbate psychological symptoms, and his medically/psychologically determinable impairments could reasonably be expected to produce the symptomology Plaintiff

27

describes.  (R. 476.)

### 3.  **Function Reports and ALJ Hearing Testimony**

In the "Function Report - Adult" completed on November 25, 2009, Plaintiff stated that his daily activities consisted of lying on a heating pad for twenty minutes in the morning, going to appointments if any were scheduled (three monthly), going for a walk at least once a day (four blocks), lying in bed when possible, and lying on a heating pad for twenty minutes before bed.  (R. 183, 187.)  He reported that previously he could sit or stand in place for more than ten minutes and walk long distances.  (R. 184.)  Plaintiff takes care of his personal needs, prepares his own meals, and does household chores like laundry, dishes, and sweeping the floor.  (R. 185.)  Plaintiff's hobbies are watching television (about five hours a day) and reading (one hour a day).  (R. 187.)  He does not spend time with others.  (*Id.*)  He said that he has trouble getting along with family and others because "[p]eople are ignorant & disrespectful.  I do not like to be around a lot of people."  (R. 188.)  Plaintiff also said that the discomfort and lack of sleep related to his impairments make him short tempered.  (*Id.*)  Plaintiff reported that his conditions affect his abilities to lift, squat, bend, stand, walk, sit, kneel, and climb stairs; they have also affected his memory, concentration, follow instructions and get along with others.  (R. 188.)  Plaintiff also stated he can only pay attention for a few minutes, is terrible at

following written instructions, and poor at following spoken
instructions. (*Id.*) Plaintiff stated that he does not get along
well with authority figures in general but if they are respectful
he gets along well. (R. 189.) He has been fired because of
problems getting along with others, explaining this happened
because the boss, supervisor or co-employees cursed at him. (*Id.*)
Finally, Plaintiff reported that he handles stress and changes in
routine poorly. (*Id.*)

At the ALJ hearing on May 26, 2011, Plaintiff confirmed that
he is alleging disability since July 1, 2006, and that he has
worked for approximately two months since that time. (R. 76.)
That job was unloading carpets when he was in a halfway house while
incarcerated and, although he was able to do it, he could not have
continued after his release. (R. 76-77.) Plaintiff also testified
that he experienced pain in his knees and lower back when he worked
the unloading job. (R. 83.) Since that time Plaintiff said he was
receiving public assistance. (R. 77.) He reported that the pain
in his back, legs, and feet keeps him from working--although it is
constant, it varies in intensity. (R. 78.) Plaintiff testified he
was being treated at Scranton Counseling Center for his mental
impairments. (R. 80.) Plaintiff confirmed that he had been
incarcerated several times because of fighting, generally serving
his full term because of misconducts he received while in prison.
(R. 85.) He also said he had over thirty jobs in his life--he

29

"just couldn't keep a job" because he didn't get along with people and the back pain started getting worse. (R. 86.)

The vocational expert testified that a hypothetical individual of Plaintiff's age, education, and work experience with a capacity to do light work with certain limitations, could not perform any of Plaintiff's past relevant work. (R. 91.) The individual, however, could perform other such as night cleaner, tagger, or garment inspector. (R. 91.) If the exertional level were reduced to sedentary, the vocational expert said the tagger and garment inspector positions would remain viable options and he would add the position of small parts assembler. (R. 92.) If the hypothetical individual were to be off task twenty percent of the day, the vocational expert confirmed that individual would be precluded from sustaining gainful employment. (R. 92-93.) The vocational expert also confirmed that gainful employment would be precluded if the limitations identified by Dr. Smith, Dr. Ciaravino and Dr. Karazim-Horchos were assumed to be accurate. (R. 93-98.)

**4. ALJ Decision**

By decision of June 20, 2011, ALJ Sweeda determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 1, 2006, through the date of the decision. (R. 67.) He made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act

30

through September 30, 2009.

2. The claimant has not engaged in substantial gainful activity since July 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease and affective disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).  The work can involve occasional kneeling, crawling, climbing, balancing, bending and stooping.  The work would not involve contact with the general public and only occasional contact with coworkers and supervisors. The work is limited to simple, repetitive tasks with environmental limitations of no exposure to temperature extremes, high humidity or vibration.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965.)

7. The claimant was born on September 26, 1966 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and

31

is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404,1569(a), 416.969, and 416.969(a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 60-67.)

Explaining his finding that Plaintiff had not engaged in substantial gainful activity since July 1, 2006, the alleged onset date, the ALJ noted that Plaintiff worked after the alleged onset date, referring to Plaintiff's job while in a halfway house at the end of his prison term.  (R. 60.)  The ALJ concluded the thirty-hour-per-week job was evidence that Plaintiff had the capacity to perform substantial gainful activity.  (*Id.*)

In making his residual functional capacity determination, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but he found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent

32

they are inconsistent with the above residual functional capacity assessment." (R. 63.) He found that although the treatment records supported some degree of limitation, they did "not support greater functional limitations than those set forth in the residual functional capacity." (*Id.*) The ALJ noted that records from Scranton Counseling Center document the infrequecny of Plaintiff's treatment. (R. 64.) He gave little weight to Dr. Smith's findings on the mental residual functional capacity assessment of mostly marked and extreme limitations because Dr. Smith was not a treating source and relied solely on the observation made on the day of the consultative examination. (Id.) He added that

> the record clearly contradicts the conclusions and the opinions expressed by Dr. Smith. . . . Dr. Smith's findings do not disclose the necessary findings to support a conclusion that this claimant's function is markedly or extremely limited in any fashion. Dr. Smith notes that the claimant would be helped by pharmacological treatment and intensive outpatient assistance none of which the claimant was getting at the time of Dr. Smith's assessment.

(R. 64.)

The ALJ gave weight to Dr. Hite's Mental Residual Functional Capcaity Assessment findings. (R. 64.) The ALJ reviewed the findings of the Psychiatric Review Technique and Assessment but does not provide reasons for the weight attributed to them. (*Id.*)

The ALJ gave little weight to the Mental Residual Functional Capcaity Assessment provided by Dr. Ciaravino, finding it is

33

"inconsistent with treatment notes and the longitudinal treatment history."[4]  (R. 65.)

Regarding Plaintiff's physical impairments, the ALJ found that imaging studies of the low back are not very impressive and could be expected to cause some mechanical back pain limiting Plaintiff to light work.  (R. 65.)  Although the ALJ finds Plaintiff slightly more limited than the opinion of the Disability Determination Service (DDS) Adjudicator, he agrees that Plaintiff has the RFC for work at the light exertional level because "it is mostly consistent with the objective findings that show the claimant was, and is capable of work."  (R. 65.)  He gives some weight to Dr. Karazim-Horchos's opinions on the RFC based on their consistency with other evidence that Plaintiff is capable of light exertional work.  (R. 65.)  Evidence cited in support of this determination is Plaintiff's December 11, 2009, visit to Geisinger for complaints of low back pain.  (*Id.*)

## II. Disability Determination Process

"In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory

---

[4]  The ALJ says the signature on the form is unknown.  (R. 65.)  However, an affidavit from Dr. Ciaravino dated October 15, 2012, confirms that she is the author of the May 2011 form.  (R. 478.)

twelve-month period." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[5]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

_____

    [5]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make

36

> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Acting

Secretary to analyze all evidence.  If she has not done so and has

not sufficiently explained the weight given to all probative

exhibits, "to say that [the] decision is supported by substantial

evidence approaches an abdication of the court's duty to scrutinize

the record as a whole to determine whether the conclusions reached

are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must

not only state the evidence considered which supports the result

but also indicate what evidence was rejected: "Since it is apparent

that the ALJ cannot reject evidence for no reason or the wrong

reason, an explanation from the ALJ of the reason why probative

evidence has been rejected is required so that a reviewing court

37

can determine whether the reasons for rejection were improper."
*Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an
exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.
Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement
that the ALJ discuss in its opinion every tidbit of evidence
included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d
Cir. 2004).  "[W]here [a reviewing court] can determine that there
is substantial evidence supporting the Commissioner's decision, . .
.  the *Cotter* doctrine is not implicated."  *Hernandez v.
Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir.
2004) (not precedential).

A reviewing court may not set aside the Commissioner's final
decision if it is supported by substantial evidence, even if the
court would have reached different factual conclusions.  *Hartranft*,
181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d
1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings
of the Commissioner of Social Security as to any fact, if supported
by substantial evidence, shall be conclusive . . .").  "However,
even if the Secretary's factual findings are supported by
substantial evidence, [a court] may review whether the Secretary,
in making his findings, applied the correct legal standards to the
facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d
Cir. 1983) (internal quotation omitted).  Where the ALJ's decision
is explained in sufficient detail to allow meaningful judicial

review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. *General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative

39

record and in explicitly weighing all evidence.  *Dobrowolsky*, 606

F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases

demonstrate that, consistent with the legislative purpose, courts

have mandated that leniency be shown in establishing the claimant's

disability, and that the Secretary's responsibility to rebut it be

strictly construed."  *Id.*

**B.   *Plaintiff's Alleged Errors***

As set out above, Plaintiff asserts the decision of the Social

Security Administration is error for several reasons: the ALJ did

not properly consider and give the required weight to mental and

physical RFC assessments; the ALJ improperly relied on certain

Global Assessment of Functioning ("GAF") scores; and the ALJ did

not adequately explain his reasons for finding Plaintiff's

testimony not credible.  (Doc. 7 at 13-15.)

**1.   Consideration of Residual Functional Capacity Assessments**

Plaintiff first argues that the ALJ's decision is not

supported by substantial evidence and he committed errors of law by

failing to give the required weight to the Mental RFC Assessments

of examining sources Drs. Smith and Ciaravino, and the physical RFC

assessment of treating physician Dr. Karazim-Horchos, all of which

reflected restrictions which the VE testified would prevent

substantial gainful employment on a sustained basis.  (Doc. 7 at

15-16.)  Plaintiff adds that the ALJ improperly substituted his own

opinions without providing good reasons for not accepting the

40

opinions of these examining and treating sources.  (Doc. 7 at 16.)
We agree and conclude that remand is required for proper
consideration of the evidence as discussed below.

The amount of weight accorded medical opinions is well-
established.  The examining relationship between the claimant and
medical opinion source is considered: more weight is given to the
opinion of an examining source than to a source who has not
examined the claimant, 20 C.F.R. §§ 416.927(c)(1) and
404.1527(c)(1); and more weight is given to a treating source than
a non-treating source, 20 C.F.R. §§ 416.927(c)(2)(i) and
404.1527(c)(2)(i).[6]

The "treating physician rule," is codified at 20 C.F.R. §§
416.927(c)(2) and 404.1527(c)(2), and is widely accepted in the
Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see
also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation
addresses the weight to be given a treating physician's opinion: if
the treating source's opinion on the nature and severity of the
claimant's impairments is well-supported by acceptable diagnostic
techniques and is not inconsistent with the other substantial
evidence, the opinion is given controlling weight. 20 C.F.R. §

---

[6]  20 C.F.R. § 416.927 addresses Supplemental Security Income
claims and 20 C.F.R. § 404.1527 addresses Disability Insurance
claims.

416.927(c)(2).[7]  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of

---

[7] 20 C.F.R. § 404.1527(c)(2) states the following:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)). When confronted with contradictory medical evidence, the ALJ may choose whom to credit, but in these instances there is an acute need for the ALJ to explain the reasoning behind conclusions. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). The *Fargnoli* court noted that the appeals court will vacate or remand a case where such an explanation is not present. *Id.*

Here the ALJ rejected the opinions of two examining sources and one treating source. The two examining sources, Thomas Smith, Psy.D., and Elizabeth Ciaravino, Ph.D., completed Mental Residual Functional Capacity Assessments. (R. 350-51, R. 475-76.) The treating source, Elizabeth Karazim-Horchos, D.O., completed a physical residual functional capacity form. (R. 400-02.) At the ALJ Hearing, the vocational expert testified that if the accuracy of Dr. Smith's, Dr. Ciaravino's, and Dr. Karazim-Horchos's assessments were assumed, Plaintiff would not be able to sustain gainful employment. (R. 93-98.)

The ALJ gave little weight to Dr. Smith's findings, pointing to the fact that Dr. Smith was not a treating source and relied only on one observation made on the day of the consultative examination. (R. 64.) This reason for discounting Dr. Smith's

43

opinion is undermined by the fact that the ALJ made no such comment
regarding the opinion of non-examining source Mark Hite, Ed.D.
(*Id.*)   The ALJ criticizes Dr. Smith's GAF of 40-50 because it a
"personalized assessment of the claimant" and Dr. Smith did not
rely on specific diagnostic test results such as IQ examinations or
specific clinical observations; rather, the GAF score evaluation
was based on Plaintiff's subjective report.   (R. 64.)   Yet, the ALJ
also recognizes that GAF scores are not subject to evaluation by
empirical standards "such as IQ's" and are exclusively the personal
rating of the examiner.   (*Id.*)   The ALJ states that "the record
clearly contradicts the conclusions and the opinions expressed by
Dr. Smith," but the ALJ does not point to any specific
contradictory evidence.   (*Id.*)   The ALJ points to Dr. Smith's
notation that Plaintiff would be helped by pharmacological
treatment and intensive outpatient assistance, and states that
Plaintiff was not getting such help at the time of the assessment.
(R. 64.)   However, the record shows that, prior to Dr. Smith's May
11, 2010, assessment, Plaintiff was seen at Scranton Counseling
Center on September 15, 2009, November 12, 2009, December 2, 2009,
February 5, 2010, February 24, 2010, and May 4, 2010.   (R. 320,
324-26, 425-27.)   The Physician's Order Sheet from Scranton
Counseling Center shows Plaintiff was prescribed various
medications for his mental health impairments in the months before
Dr. Smith's assessment.   (R. 443-44.)   The ALJ notes that Dr. Smith

44

does not disclose the necessary findings to support his conclusions that Plaintiff's function was marked or extremely limited in any way. (*Id.*)  The form submitted by Dr. Smith shows that he wrote "Clinical Interview" in answer to the question of what medical/clinical findings supported his assessment. (*See* R. 350.) In his summary, Dr. Smith stated that "[t]he claimant's cognitive schema of how he sees himself in the world and how the world has impacted him seems to be a significant obstacle in his ability to engage and interact in this world." (R. 354.)  While Dr. Smith's notations may not be sufficient support for his findings, the difficulty in establishing mental health impairments warrants careful consideration of opinions proffered by examining sources.[8] This review of the rationale provided by the ALJ indicates that he did not properly support the weight given to Dr. Smith's assessment in that he did not adequately explain the reasoning behind his conclusions. *Fargnoli*, 247 F.3d at 42.

Defendant's attempt to support the ALJ's conclusion with specific argument and citation to the record (Doc. 8 at 19-20) is unavailing in that Defendant cannot do at this stage of the proceedings what the ALJ was required to do in arriving at his decision.  It is the ALJ's responsibility to explicitly provide

---

[8]  "A psychologist's opinion is almost always based to a large degree on the patient's 'self-reporting,' so an over-reliance on this fact would make it extremely difficult for a claimant to establish disability based on mental impairments." *Cotton v. Astrue*, 374 F. App'x 769, 774 (9th Cir. 2010).

reasons for his decision and the analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision.  *Fargnoli*, 247 F. 3d at 42 n.6; *Dobrowolsky*, 606 F.2d at 406-07; *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council.")

The ALJ accorded little weight to Dr. Ciaravino's opinion "because it is inconsistent with treatment notes and the longitudinal treatment history."  (R. 65.)  The ALJ does not elaborate or point to contradictory treatment notes.  His review of treatment notes is sparse at best.  Although Plaintiff was treated at Scranton Counseling Center in 2007 prior to his two-year incarceration (*see* R. 455, 470) and from September 2009 through April 2011 (*see* R. 441) and the record contains numerous individual treatment notes, the ALJ provides only the following specific discussion:

> The evidence consists of a Psychiatric/Intake/Psycho-Social Evaluation and treatment notes from Scranton Counseling Center dated September 2009 through December 2009.  The claimant's intake diagnosis was bipolar disorder, ADHD, legal issues with a GAF of 60 (Exhibit 4F/11).  A GAF of 60 is one point below the mild range.  In the present case, the claimant's level of functioning is consistent with this description.  It appears he has no functional limitations from his alleged mental impairments.  Other records from Scranton Counseling Center from February 2010 to April 2011 consistently give the claimant a GAF of 55-60 (Exhibit 14F).  This is consistent with

46

the results of a psychological evaluation of
Dr. Ciaravino which the Representative
ordered on May 6, 2011.  Dr. Ciaravino also
diagnoses the claimant with bipolar and ADHD
with a GAF of 55 (Exhibit 16F).

Treatment records from Scranton
Counseling Center document the infrequency of
the claimant's treatment.  For instance, the
claimant was treated on December 2, 2009 and
February 24, 2009 but then he was not treated
again until June 11, 2010.  There is also a
gap in treatment from July 14, 2010 until
October 25, 2010 and from December 29, 2010
until April 26, 2011 (Exhibit 15F).

(R. 63-64.)  From this discussion we do not find support for the

ALJ's conclusory statement that Dr. Ciaravino's Mental RFC

Assessment "is inconsistent with treatment notes and the

longitudinal treatment history."  (R. 65.)  Again, Defendant

provides additional analysis (Doc. 8 at 21-22) but it does not save

the ALJ's deficient support for the conclusion upon which he bases

the little weight he assigns Dr. Ciaravino's opininion.

The ALJ's consideration of Dr. Karazim-Horchos's opinion is

also flawed.  The ALJ gave "some weight" to Dr. Karazim-Horchos's

opinions on the residual functional capacity form, finding them

"consistent with the other evidence which indicates that the other

evidence which indicates that the claimant is capable of light

exertional work."  (R. 65.)  The ALJ did not discuss those

portions of Dr. Karazim-Horchos's assessment which support greater

limitations.  In addition to noting that she believed Plaintiff's

complaints of pain (listing Plaintiff's spinal conditions to be the

47

cause of the pain as supported by MRI findings showing an annular tear at L4-L5, and disc herniation at L5-S1 (R. 401)), Dr. Karazim-Horchos found that previously identified limitations could be further reduced by the pain and Plaintiff's pain was present at the levels described. (*Id.*) She further noted that the degree of pain was occasionally debilitating and she did not know if Plaintiff had any psychological conditions which affected his pain or if he was a malingerer. (R. 402.) Dr. Karazim-Horchos opined that Plaintiff's symptoms would often interfere with his attention and concentration. (*Id.*) She reported that he would need to take two fifteen to thirty-minute unscheduled breaks during an eight-hour workday. (*Id.*) She also noted that Plaintiff would likely be absent from work about three times a month as a result of his back impairment. (*Id.*) Because "an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper," *Cotter*, 642 F.2d at 706-07, the ALJ erred in not discussing the probative evidence cited above.

## 2.   **ALJ's Reliance on GAF Scores**

Plaintiff maintains that the ALJ erred in his consideration of GAF scores and used the occasional GAF scores mentioned in Scranton Counseling Center records to ignore Dr. Smith's opinion of Plaintiff's RFC. (Doc. 7 at 20.) Plaintiff identifies the GAF score discrepancy as the "principal reason" for dismissing Dr.

48

Smith's opinion.  (*Id.*)  It is true that the ALJ discounted Dr.
Smith's GAF score assessment.  (*See* R. 64.)  However, as discussed
above, the ALJ discounted the assessment for several reasons
although he did not adequately support the reasons provided.
Because we have determined that remand is required for proper
consideration of the evidence, including the ALJ's analysis and
conclusion regarding Dr. Smith's assessment, further discussion of
this claimed basis of error is not necessary.

3.   **ALJ's Credibility Determination**

     Plaintiff asserts that the ALJ erred in finding Plaintiff's
testimony not credible without adequately explaining his reasons
for doing so.  (Doc. 7 at 23.)  Specifically, Plaintiff cites the
ALJ's question regarding Plaintiff taking Percocet and a positive
test for cocaine.  (Doc. 7 at 23.)  We do not find that the ALJ's
reference to Plaintiff taking Percocet and the specific credibility
conclusion regarding the positive cocaine test (*see* R. 63) render
his credibility finding error.  However, the ALJ's credibility
analysis is flawed in that the ALJ does not disclose the evidence
upon which it is based.

     The ALJ notes Plaintiff's ability to take public
transportation, vaccuum, and cook, but he does not say how these
activities undermine the limitations Plaintiff associates with his
impairments.  (*See* R. 63.)  The only specific basis identified to
support his credibility conclusion is the ALJ's statement that

49

Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 63.)

Our review of the record reveals no evidence that Plaintiff's treating or examining sources found Plaintiff's subjective complaints unfounded.[9]

The ALJ's conclusory statement regarding Plaintiff's credibility (R. 63) may be a statement of his assessment of Plaintiff's subjective reporting, but it does not provide a valid reason for discounting the alleged symptoms.  In *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), the Seventh Circuit criticized the same language as that of the ALJ here, referring to it as "opaque boilerplate" similar to the "meaningless boilerplate" identified in an earlier decision.  *Id.* (citing *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)).  The Seventh Circuit explained its reasoning in *Filus v. Astrue*, 694 F.3d 863 (7th Cir. 2012):

> We criticized this boilerplate in *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012), and our opinion has not changed since *Bjornson* was issued.  Obvious problems

---

[9]    For example, as discussed previously in the text, the ALJ did not discuss those portions of Dr. Karazim-Horchos's assessment which support greater limitations than those consistent with his RFC. (*See* R. 402.)

> include . . . the fact that this statement
> puts the cart before the horse, in the sense
> that the determination of capacity must be
> based on the evidence, including the
> claimant's testimony, rather than forcing the
> testimony into a foregone conclusion.  In
> *Bjornson*, this flaw required us to reverse
> and remand, but that is not always necessary.
> If the ALJ has otherwise explained his
> conclusion adequately, the inclusion of this
> language can be harmless.

694 F.3d at 868.

In this case, the ALJ has not otherwise explained his credibility finding.  (*See* R. 63.)  Thus, we agree with Plaintiff's broad argument that the ALJ erred because he did not explain why he found Plaintiff's testimony not credible (Doc. 7 at 23). Defendant's assertion that the ALJ's credibility analysis is supported by substantial evidence is not persuasive: although we agree that the ALJ is charged with the duty of determining credibility, we cannot determine the reasons for his decision. (*See* Doc. 8 at 27 (citing *Casey v. Colvin*, No. 12-2272, 2014 WL 4258716, at *11 (M.D. Pa. Aug. 27, 2014); SSR 96-7p, 1996 WL 374186; *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 156 (3d Cir. 2007) ("When making credibility findings, the ALJ must indicate which evidence he rejects and which he relies upon as the basis for his findings.")).

## **V. Conclusion**

For the reasons discussed above, this case must be remanded to the Acting Commissioner for further consideration consistent with

this opinion.   An appropriate Order is filed simultaneously with

this Memorandum.

                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge

DATED: November 25, 2014